**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order

United States Courts
Southern District of Texas
FILED

*June 18, 2026*

Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Criminal No.** **4:26-cr-372** |
| | § | |
| **TONYA CROWDER,** | § | |
| **MARLENE DURHAM, and** | § | |
| **DEMETRIUS ONUAGULUCHI,** | § | |
| **Defendants.** | § | |

## INDICTMENT

The Grand Jury charges:

## GENERAL ALLEGATIONS

At all times material to the Indictment, unless otherwise specified:

1.      The Controlled Substances Act ("CSA"), Title 21, United States Code, Section 801 *et seq*., governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

2.      The CSA and its implementing regulations set forth which drugs and other substances are defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

3.      A controlled substance assigned to "Schedule II" meant that the drug had a high potential for abuse, the drug had a currently accepted medical use in treatment in the United States, or the drug had a currently accepted medical use with severe restrictions.  A controlled substance

1

assigned to "Schedule IV" meant that the drug had a lower potential for abuse relative to the drugs in the higher Schedules, including Schedule II; the drug had a currently accepted medical use in treatment in the United States; and abuse of the drug could lead to limited physical dependence or psychological dependence relative to drugs in the higher Schedules, including Schedule II.

4.      Pursuant to the CSA and its implementing regulations:

a.      Oxycodone was classified as a Schedule II controlled substance. Oxycodone, sometimes prescribed under brand names, including Roxicodone, was used to treat severe pain. Oxycodone, as with other opioids, was highly addictive.

b.      Hydrocodone was classified as a Schedule II controlled substance. Hydrocodone, sometimes prescribed under brand names including Norco, Lortab, and Vicodin, was used to treat severe pain. Hydrocodone, as with other opioids, was highly addictive.

c.      Carisoprodol was classified as a Schedule IV controlled substance. Carisoprodol, sometimes prescribed under the brand name Soma, was a purported muscle relaxant and was highly addictive. The FDA recommended carisoprodol only for acute treatment for two to three weeks at a time.

5.      It was well known that the combination of high-dose opioids, including oxycodone or hydrocodone, and carisoprodol, significantly increased the risk of patient intoxication and overdose. Moreover, prescribing oxycodone or hydrocodone and carisoprodol often created a significant risk of diversion because the two drugs, prescribed together, were often highly abused and sought for a non-legitimate medical purpose due to the increased "high" a user could experience from taking hydrocodone or oxycodone along with carisoprodol.

6.      Accordingly, for a treating physician to prescribe the combination of high-dose opioids and carisoprodol for a legitimate medical purpose, the physician needed to determine, at a minimum, that the benefits of the drugs outweighed the risks to the patient's life.

7.      Medical practitioners, such as pharmacists, physicians, and nurse practitioners, who were authorized to prescribe, distribute, or dispense controlled substances by the jurisdiction in which they were licensed to practice were authorized under the CSA to prescribe, or otherwise distribute or dispense controlled substances, if they were registered with the Attorney General of the United States. 21 U.S.C. § 822(b). Upon application by the practitioner, the Drug Enforcement Administration ("DEA") assigned a unique registration number to each qualifying medical practitioner including physicians, pharmacies, and nurse practitioners.

8.      Chapter 21 of the Code of Federal Regulations, Section 1306.04 governed the issuance of prescriptions and provided, among other things, that a prescription for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of her professional practice." Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

9.      With exceptions not applicable here, only appropriately licensed and registered pharmacies could dispense controlled substances, and only pursuant to prescriptions issued for a legitimate medical purpose by an appropriately licensed and registered practitioner acting in the usual course of his professional practice. *See* 21 C.F.R. §§ 1306.04 and 1306.06. The issuing physician and the pharmacist who filled the prescription for a controlled substance shared a corresponding responsibility for its proper prescribing and dispensing. *See* 21 C.F.R. § 1306.04.

10.    All prescriptions for controlled substances were required to be "dated as of, and signed on, the day when issued and [were required to] bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner." 21 C.F.R. § 1306.05(a). "The refilling of a prescription for a controlled substance listed in Schedule II [was] prohibited." 21 C.F.R. § 1306.12(a); 21 U.S.C. § 829(a).

11.    In Texas, in a clinical setting, only physicians who were licensed to practice medicine were permitted to prescribe Schedule II controlled substances, including oxycodone and hydrocodone.

12.    In Texas, in a clinical setting, a physician could not delegate to a non-physician the authority to issue prescriptions for Schedule II controlled substances.

13.    The Texas Prescription Monitoring Program ("PMP") was a database of all reported prescriptions for controlled substances that were issued and dispensed in Texas. The database was maintained by the Texas State Board of Pharmacy ("TSBP"). For all controlled substances dispensed, pharmacies were required to report to the PMP details which included: the patient's name, the particular controlled substance and dosage dispensed, the quantity dispensed, the number of days supplied, the prescribing physician's name, the date the prescription was issued, the dispensing pharmacy's name, the type of payment, and the date the controlled substances were dispensed.

14.    A "crew leader" was someone who found and paid individuals, many of whom were homeless or impoverished, to pose as chronic pain patients ("purported patients"); transported the

purported patients (often in groups) to a clinic; coached the purported patients in filling out patient intake documentation to support a prescription for pain medication and paid for the "visit with the doctor" (*i.e.*, the illegitimate prescription); took the purported patients (or just the illegitimate prescription) to the pharmacy; and paid for and took control of the prescription drugs, often to divert and sell them on the street for profit.

15.     A "runner" was an individual that worked for a crew leader and "ran," or coordinated taking purported patients to clinics and pharmacies to obtain controlled substances. A runner often transported purported patients to the clinics or pharmacies for the crew leader, and often paid purported patients, clinics, and pharmacies on behalf of the crew leader.

### RELEVANT INDIVIDUALS AND ENTITIES

16.     Physician 1, a resident of Harris County, Texas, was a medical doctor and a purported physical medicine and rehabilitation specialist licensed to practice medicine in the State of Texas since in or around 2018. Between 2022 and 2025, Physician 1 practiced medicine from various clinics in the Southern District of Texas, including a clinic referred to as the Westheimer Clinic ("Westheimer Clinic") and Texas Health Care, LLP (the "THC Clinic").

17.     **TONYA CROWDER ("CROWDER")**, a resident of Fort Bend County, Texas, was a business associate of Physician 1, and the office manager of the THC Clinic.

18.     **MARLENE DURHAM ("DURHAM")**, a resident of Harris County, Texas was a business associate of Physician 1, and the office manager of the Westheimer Clinic.

19.     **DEMETRIUS ONUAGULUCHI ("ONUAGULUCHI")**, a resident of Harris County, Texas, was the owner and pharmacist-in-charge ("PIC") of Wellwise Pharmacy, Inc.,

5

("Wellwise") a pharmacy located at 2519 North Frazier Street, Suite 3200, Conroe, Texas 77303. **ONUAGULUCHI** was licensed to practice pharmacy in the State of Texas.

20.    The THC Clinic, a cash-only clinic co-owned by Physician 1 and **CROWDER**, operated out of the following locations: 4458 West Fuqua St., Suite 400, Houston, Texas between November 2024 and July 2025; 8191 Southwest Freeway, Suite 115, Houston, Texas between December 2022 and May 2023; 4141 Southwest Freeway, Suite 410 between May 2023 and July 2024; and 5555 West Loop South, Suite 602, Houston, Texas between July 2024 and October 2024.

21.    The Westheimer Clinic, a cash-only clinic co-owned by Physician 1 and **DURHAM**, operated out of 12757 Westheimer Road, Houston, Texas between approximately November 2022 and March 2025.

## COUNT 1
### Conspiracy to Unlawfully Distribute and Dispense Controlled Substances
### (21 U.S.C. § 846)

22.    Paragraphs 1 through 21 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

23.    Beginning in or around November 2022, and continuing through in or around July 2025, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, Defendants,

**TONYA CROWDER,**
**MARLENE DURHAM, and**
**DEMETRIUS ONUAGULUCHI,**

knowingly and intentionally combined, conspired, confederated, and agreed with each other and others known and unknown to the Grand Jury, to violate Title 21, United States Code, Sections

6

841(a)(1), (b)(1)(C), and (b)(2), that is, to unlawfully, knowingly and intentionally distribute and dispense, mixtures and substances containing a detectable amount of controlled substances, including oxycodone and hydrocodone, both Schedule II controlled substances, and carisoprodol, a Schedule IV controlled substance, knowing that such distribution and dispensing was unauthorized, and intending for such distribution and dispensing to be unauthorized.

### Purpose of the Conspiracy

24.     It was the purpose and object of the conspiracy for the Defendants, Physician 1, and others to unlawfully enrich themselves by, among other things: (a) selling prescriptions for controlled substances without a legitimate medical purpose and outside the usual course of professional practice; (b) distributing and dispensing controlled substances without a legitimate medical purpose and outside the usual course of professional practice; and (c) depositing cash generated  from the unlawful sale of prescriptions for controlled substances and from the unlawful sale of controlled substances into bank accounts.

### Manner and Means of the Conspiracy

The manner and means by which the Defendants and others sought to accomplish the purpose and object of the conspiracy included, among other things:

25.     Physician 1 maintained DEA registration numbers and an active medical license in the State of Texas. Physician 1 provided access and gave permission to **CROWDER**, **DURHAM**, and others at the THC Clinic and the Westheimer Clinic to use their DEA registration numbers so **CROWDER**, **DURHAM**, and others could electronically authorize prescriptions for controlled substances, including oxycodone and hydrocodone.

7

26.    **CROWDER**, **DURHAM** and others at the THC Clinic and the Westheimer Clinic used Physician 1's DEA Registration Number to prescribe controlled substances, including oxycodone, hydrocodone, and carisoprodol, knowing the prescriptions had no legitimate medical purpose and were issued outside the usual course of professional practice. The vast majority of prescriptions issued in Physician 1's name by **CROWDER**, **DURHAM,** and others at the THC Clinic and the Westheimer Clinic were for oxycodone 30mg or hydrocodone 10/325mg, or carisoprodol 350mg, the highest dosage strengths of hydrocodone and carisoprodol, and the highest short-acting dosage strength of oxycodone, and were for same or substantially similar dosage units (pills)—100 to 120 pills of oxycodone or hydrocodone.

27.    **CROWDER** and **DURHAM** oversaw the day-to-day operations of the THC Clinic and the Westheimer Clinic, respectively, and sought to maximize the amount of revenue generated at each.  **CROWDER** and **DURHAM** set the prices for prescriptions of controlled substances at the THC Clinic and the Westheimer Clinic, respectively.  Prices depended on the drug or drugs the crew leaders, runners, and purported patients sought.  The THC Clinic and the Westheimer Clinic generally charged $300 per prescription of hydrocodone 10/325mg, and $400 per prescription of oxycodone 30mg.

28.    **CROWDER** and **DURHAM** obtained purported patients from crew leaders and runners, and others who visited the THC Clinic and the Westheimer Clinic. Crew leaders often paid these individuals to pose as patients and obtain prescriptions from the THC Clinic and the Westheimer Clinic. Crew leaders then made sure the purported patients filled their prescription at trusted pharmacies, including sending prescriptions to **ONUAGULUCHI** at Wellwise, and then take possession of the controlled substances to divert for street-level distribution.

8

29. Crew leaders, runners, and purported patients paid cash to the THC Clinic or the Westheimer Clinic for prescriptions of hydrocodone, oxycodone, carisoprodol, and other drugs issued under Physician 1's prescriptive authority. **CROWDER** and **DURHAM** knew that these prescriptions were issued (and also intended for these prescriptions to be issued) without a legitimate medical purpose, and outside the usual course of professional practice.

30. To make the clinics they managed appear to be legitimate, **CROWDER** and **DURHAM** employed non-physician health care workers such as nurse practitioners at the THC Clinic and the Westheimer Clinic, respectively. These non-physician health care workers would at times perform perfunctory examinations of purported patients before the patients received a prescription for a controlled substance. In the usual course of business, Physician 1 neither examined nor interacted with purported patients of the THC Cinic or the Westheimer Clinic. Nor would Physician 1 personally issue prescriptions to purported patients at the THC Clinic or the Westheimer Clinic. Rather, Physician 1 permitted **CROWDER**, **DURHAM**, and others to use their electronic medical record to unlawfully prescribe controlled substances in her name to purported patients at the THC Clinic and the Westheimer Clinic.

31. Physician 1 is the top prescribing physician of controlled substances for Wellwise, representing over half of the count of controlled substance prescriptions. **ONUAGULUCHI** communicated with Physician 1, **DURHAM**, **CROWDER**, crew leaders, runners, and purported patients about the prescriptions issued at the THC Clinic and Westheimer Clinic under Physician 1's authority. **ONUAGULUCHI** specifically sought advice from **DURHAM** about which crew leaders he could trust. **ONUAGULUCHI** conspired with Physician 1, **DURHAM**, **CROWDER**, crew leaders, runners, and purported patients to fill prescriptions without a legitimate medical purpose and outside the course of professional practice. **ONUAGULUCHI** also conspired with

other pill mill clinics that operated in a similar manner to fill prescriptions without a legitimate medical purpose and outside the course of professional practice.

32.     Between in or around 2021 and in or around 2025, over 3 million controlled-substance pills of oxycodone 30mg, hydrocodone 10/325mg, and carisoprodol 350mg prescriptions, including over 2 million pills of oxycodone 30mg, over 900,000 pills of hydrocodone 10/325mg, and over 500,000 pills of carisoprodol 350mg prescriptions—the highest dosage strengths of hydrocodone and carisoprodol, and the highest short-acting dosage strength of oxycodone—were issued using the prescribing credentials of Physician 1 at the THC Clinic and the Westheimer Clinic—the vast majority of which were unauthorized, were issued without a legitimate medical purpose, and were outside the usual course of professional practice.

33.     Between in or around 2022 and in or around 2025, over 138,000 controlled-substance pills of oxycodone 30mg, hydrocodone 10/325mg, and carisoprodol 350mg prescriptions, including over 68,000 pills of oxycodone 30mg, over 41,000 pills of hydrocodone 10/325mg, and over 28,000 pills of carisoprodol 350mg prescriptions—the highest dosage strengths of hydrocodone and carisoprodol, and the highest short-acting dosage strength of oxycodone were issued using the prescribing credentials of Physician 1 and other physicians through Wellwise—the vast majority of which were not for a legitimate medical purpose, outside the usual course of professional practice, and in an unauthorized manner.

34.     The proceeds were disbursed to the Defendants, their coconspirators, and others, and the Defendants each personally profited between hundreds of thousands of dollars and millions of dollars from the drug diversion scheme.

All in violation of Title 21, United States Code, Section 846.

10

## COUNTS TWO THROUGH FIVE
### Unlawfully Distributing and Dispensing Controlled Substances and Aiding and Abetting
### (21 U.S.C. § 841 & 18 U.S.C. § 2)

35.     Paragraphs 1 through 34 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

36.     On or about the dates specified below, in the Houston Division of the Southern District of Texas and elsewhere, Defendant,

**TONYA CROWDER,**

aiding and abetting, and aided and abetted by others known and unknown to the Grand Jury, did knowingly and intentionally distribute and dispense the controlled substance alleged below, knowing and intending that such distribution and dispensing was unauthorized:

| Count | Controlled Substance | On Or About Date | Pills | Purported Patient |
|-------|---------------------|------------------|-------|-------------------|
| 2 | Oxycodone 30mg | January 16, 2023 | 108 | J.N. |
| 3 | Oxycodone 30mg | January 20, 2023 | 100 | F.M. |
| 4 | Hydrocodone 10/325 mg | April 24, 2023 | 108 | D.R. |
| 5 | Hydrocodone 10/325 mg | April 2, 2024 | 90 | L.M. |

Each in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), and Title 18, United States Code, Section 2.

## COUNTS SIX AND SEVEN
### Unlawfully Distributing and Dispensing Controlled Substances and Aiding and Abetting
### (21 U.S.C. § 841 & 18 U.S.C. § 2)

37.     Paragraphs 1 through 34 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

38.     On or about the dates specified below, in the Houston Division of the Southern District of Texas and elsewhere, Defendant,

11

**MARLENE DURHAM,**

aiding and abetting, and aided and abetted by, others known and unknown to the Grand Jury, did knowingly and intentionally distribute and dispense the controlled substance alleged below, knowing and intending that such distribution and dispensing was unauthorized:

| Count | Controlled Substance | On Or About Date | Pills | Purported Patient |
|---|---|---|---|---|
| 6 | Hydrocodone 10/325 mg | December 14, 2023 | 110 | L.M. |
| 7 | Hydrocodone 10/325 mg | November 16, 2023 | 100 | J.M.S. |

Each in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), and Title 18, United States Code, Section 2.

**COUNTS EIGHT THROUGH ELEVEN**

39.     Paragraphs 1 through 34 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

40.     On or about the dates specified below, in the Houston Division of the Southern District of Texas and elsewhere, Defendants,

**TONYA CROWDER, and**
**DEMETRIUS ONUAGULUCHI,**

aiding and abetting, and aided and abetted by, each other and others known and unknown to the Grand Jury, did knowingly and intentionally distribute and dispense the controlled substance alleged below, knowing and intending that such distribution and dispensing was unauthorized:

| Count | Controlled Substance | On Or About Date | Pills | Purported Patient |
|---|---|---|---|---|
| 8 | Hydrocodone 10/325 mg | April 17, 2025 | 110 | J.R. |
| 9 | Hydrocodone 10/325 mg | April 21, 2025 | 110 | R.D. |
| 10 | Hydrocodone 10/325 mg | May 19, 2025 | 90 | W.C. |
| 11 | Hydrocodone 10/325 mg | May 19, 2025 | 90 | G.L. |

12

## NOTICE OF CRIMINAL FORFEITURE
### (21 U.S.C. § 853(a))

41. Pursuant to Title 21, United States Code, Section 853(a), the United States of America gives notice to Defendants,

**TONYA CROWDER,**
**MARLENE DURHAM, and**
**DEMETRIUS ONUAGULUCHI,**

that upon conviction of an offense in violation of Title 21, United States Code, Sections 841 and 846, as alleged in Counts One through Eleven, the following is subject to forfeiture: (a) all property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such violation; and (b) all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

### PROPERTY SUBJECT TO FORFEITURE

The property to be forfeited includes, but is not limited to, the following:

   a. $78,732 in United States Currency seized from a residence in Missouri City, Texas;

   b. $11,462 in United States Currency seized from the THC clinic; and

   c. The Real Property, including any improvements and appurtenances thereto, located at 838 Pecan Valley Drive, Wharton, Texas 77488, and legally described as:

   TRACT NO. FOUR (4), JAD ACRES, A SUBDIVISION IN THE FRANCIS BIGGAM LEAGUE, ABSTRACT NO. 7, WHARTON COUNTY, TEXAS, AS SHOWN BY PLAT THEREOF RECORDED IN SLIDE 39A OF THE WHARTON COUNTY PLAT RECORDS.

### MONEY JUDGMENT

Defendants are notified that, upon conviction, a monetary judgment may be imposed equal to the total value of the property subject to forfeiture for which the defendants may be jointly and severally liable.

13

## SUBSTITUTE ASSETS

Defendants are notified that in the event that property subject to forfeiture, as a result of any act or omission any defendant,

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property that cannot be divided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the defendant up to the total value of such property pursuant to Title 21, United States Code, Section 853(p), incorporated by reference in Title 28, United States Code, Section 2461(c).


A TRUE BILL

Original Signature on File

_____

FOREPERSON


JOHN G.E. MARCK
ACTING UNITED STATES ATTORNEY



*Alexander Alum*
ALEXANDER ALUM
KATHRYN OLSON
ASSISTANT UNITED STATES ATTORNEYS
SOUTHERN DISTRICT OF TEXAS


14